EXHIBIT A

Arbitral award issued in the arbitration *Asia Genius Investment Limited v. Bariven S.A.* (ICC Case No. 25004/JPA/AJP (C-25005/JPA-25006/JPA-25007/JPA-25008/JPA-25009/JPA-25010/JPA-25011/JPA)) on March 20, 2023 (the "**Award**").

**Final Award**

ICC Case No. 25004/JPA/AJP

(C-25005/JPA-25006/JPA-25007/JPA-25008/JPA-25009/JPA-25010/JPA-25011/JPA)

In the matter of the arbitrations

Under the Rules of Arbitration of the International Court of Arbitration of the
International Chamber of Commerce (Rules 2017)

Between

**ASIA GENIUS INVESTMENT LIMITED**

(Hong Kong)

CLAIMANT

And

**BARIVEN S.A.**

(Venezuela)

RESPONDENT

**Arbitral Tribunal**

Nathalie Voser

Paul Arrighi

Bregje Korthals Altes, President

20 March 2023

**Table of Contents**

1.  ABBREVIATIONS..................................................................................................3
2.  PARTIES TO THE ARBITRAL PROCEEDINGS.................................................4
    A. Claimant ..........................................................................................................4
    B. Respondent and Respondent's Agent PDVSA Services .............................4
3.  THE ARBITRAL TRIBUNAL .............................................................................5
4.  ARBITRATION CLAUSE, PLACE AND LANGUAGE OF THE ARBITRATION, AND
    APPLICABLE LAW..............................................................................................6
5.  PROCEDURAL HISTORY ...................................................................................7
    A. Commencement of the Arbitration .................................................................7
    B. Consolidation of the Arbitration ...................................................................9
    C. Constitution of the Tribunal .........................................................................9
    D. Compliance discussions and Terms of Reference....................................10
    E. Conduct of the Arbitration ..........................................................................11
6.  FACTUAL BACKGROUND...............................................................................13
    A. Issuance of Purchase Orders....................................................................14
    B. Delivery of materials ordered under the POs............................................15
    C. Issuance and payment of invoices ...........................................................15
    D. Correspondence on invoices.....................................................................18
7.  OVERVIEW OF CLAIMANT'S POSITION ......................................................19
8.  RELIEF SOUGHT..............................................................................................21
9.  JURISDICTION .................................................................................................22
    A. Background ...................................................................................................23
    B. Applicable law..............................................................................................23
    C. Clause 27 of the T&C qualifies as an arbitration agreement ......................24
    D. Asia Genius and Bariven consented to arbitration....................................24
    E. The arbitration agreement is formally valid................................................27
    F. Venezuelan law does not prevent the Tribunal from having jurisdiction ...................27
    G. The subject matter of the dispute is arbitrable.........................................29
    H. The Tribunal was validly constituted ........................................................29
    I.  Conclusion ...................................................................................................30
10. THE TRIBUNAL'S REASONING ON THE LIABILITY AND THE QUANTUM OF
    CLAIMANT'S CLAIM .......................................................................................30
11. DECISION ON COSTS......................................................................................35
    A. Claimant's costs..........................................................................................36
    B. The Tribunal's assessment and decision on costs ...................................37
12. DECISION ......................................................................................................38

1.    **ABBREVIATIONS**

1.    In this Final Award, the Tribunal will use the following abbreviations and definitions:

| | |
|---|---|
| Arbitrator Statement | ICC Arbitrator Statement on Acceptance, Availability, Impartiality, and Independence |
| Claimant / Asia Genius | Asia Genius Investment Limited |
| Court | International Court of Arbitration of the International Chamber of Commerce |
| DCC | Dutch Civil Code |
| DCCP | Dutch Code of Civil Procedure |
| ICC | International Chamber of Commerce |
| Rules | ICC Arbitration Rules in force as from 1 March 2017 |
| RfAs | Requests for Arbitration |
| RfQ/RfQs | Request/Requests for Quotation |
| PDVSA Services | PDVSA Services B.V. |
| PO 1 | Purchase Order No. 1 5100098859 of 12 June 2012 |
| PO 2 | Purchase Order No. 2 5100098865 of 12 June 2012 |
| PO 3 | Purchase Order No. 3 5100098867 of 12 June 2012 |
| PO 4 | Purchase Order No. 4 5100099209 of 25 June 2012 |
| PO 5 | Purchase Order No. 5 5100103204 of 12 September 2012 |
| PO 6 | Purchase Order No. 6 5100103644 of 30 November 2012 |
| PO 7 | Purchase Order No. 7 5100104670 of 18 January 2013 |
| PO 8 | Purchase Order No. 8 5100106922 of 24 April 2013 |
| PO 9 | Purchase Order No. 9 5100106941 of 25 April 2013 |
| Purchase Orders / POs | Purchase Orders 1-9 |
| Respondent / Bariven | Bariven S.A. |
| SCAI | Swiss Chambers' Arbitration Institution |
| Secretariat | Secretariat of the Court |
| Secretary General | Secretary General of the Court |
| SoC | Statement of Claim |
| T&C | PDVSA Services B.V. Terms and Conditions for Goods Purchases Revision 08-2009 |
| Tribunal or Arbitral Tribunal | The Arbitral Tribunal, which consists of three arbitrators |
| VCAA | Venezuelan Commercial Arbitration Act |

3

2. **PARTIES TO THE ARBITRAL PROCEEDINGS**

    A. **Claimant**

2.    Claimant in these arbitral proceedings is Asia Genius Investment Limited, a company incorporated under the laws of Hong Kong ("**Claimant**" or "**Asia Genius**"). Its business entails the purchase, sale and distribution of goods, merchandise, and equipment, and is located at Flat R/M 110 Block B 2/F Grand Industrial Building, 159-165 Wo Yi Hop Road, Kwai Chung, Hong Kong, People's Republic of China.

3.    Asia Genius is represented in these arbitral proceedings by its duly authorized counsel:

    Mr. Jean Paul Dechamps, Mr. Gustavo Topalian, Mr. Pablo Jaroslavsky, Mr. Juan Ignacio González Mayer and Ms. Julieta Cappelletti

    DECHAMPS INTERNATIONAL LAW

    10 Bloomsbury Way
    London, WC1A 2SL
    United Kingdom
    Emails: jpdechamps@dechampslaw.com; gtopalian@dechampslaw.com;
    pjaroslavsky@dechampslaw.com; jgmayer@dechampslaw.com;
    jcappelletti@dechampslaw.com

    Ms. Alexandra Schluep and Ms. Roelien van den Berg

    SSHJ ADVOCATEN,

    De Lairessestraat 97
    1071 NX Amsterdam
    The Netherlands
    Email: a.schluep@sshj.eu; r.vandenberg@sshj.eu

    And:

    Mr. Jonathan J. Gass

    19 King Frederick Ninth Tower
    London, SE16 7TH
    United Kingdom
    Email: jjg@gassarbitration.com

    B. **Respondent and Respondent's Agent PDVSA Services**

4.    The Respondent is Bariven S.A., a company incorporated under the laws of Venezuela ("**Respondent**" or "**Bariven**"). Bariven is a wholly owned Venezuelan subsidiary of Petróleos de Venezuela S.A., the Venezuelan state-owned oil and natural gas company. Bariven's address is as follows:

    Edificio Petróleos de Venezuela, Torre Este

Av. Libertador, la Campiña
Distrito Metropolitano de Caracas
Distrito Capital, 169
Bolivarian Republic of Venezuela

5.   Bariven has not appeared in these arbitral proceedings and is not represented by counsel.

6.   Asia Genius and Bariven are hereinafter jointly referred to as the "**Parties**" and each individually as a "**Party**".

7.   In line with the Parties' communications, a copy of all correspondence is also sent to the party recognized in the PDVSA Services' Terms and Conditions for Goods Purchases Revision 08-2009 (the "**T&C**"), as Respondent's agent: PDVSA Services B.V.  ("**PDVSA Services**"), with its corporate seat in Leidschendam, the Netherlands. The company previously had an establishment at the President Kennedylaan 19, 2517 JK The Hague, but currently no longer has an establishment in the Netherlands. Its recent address, according to the Dutch Chamber of Commerce is:

Calle Acapulco
Casa Nro 6, Urb Chilemex, Sector Mexico, Pto Ordaz
Ciudad Guayana
Bolivar State, 8050
Bolivarian Republic of Venezuela

**3.    THE ARBITRAL TRIBUNAL**

8.   The Tribunal is composed of:

Ms. Nathalie Voser (co-arbitrator)

ROTHORN LEGAL AG
Bahnhofstrasse 89/Schützengasse 14
8001 Zürich
Switzerland


Mr. Paul Fabien Arrighi Bustamante (co-arbitrator)

ARRIGHI MANTERO SANTI ABOGADOS
Juan Carlos Gómez 1445 Esc 201.
11000 Montevideo
Uruguay


Ms. Bregje Korthals Altes

YSQUARE B.V.
Valley | 7th floor West
Beethovenstraat 533

> 1083 HK Amsterdam
>
> The Netherlands

9.    The Tribunal is assisted by Ms. Hanneke Schreur, who was appointed as the Tribunal's secretary by email on 17 June 2022. She also holds office at Ysquare B.V., at the address mentioned above.

## 4.    ARBITRATION CLAUSE, PLACE AND LANGUAGE OF THE ARBITRATION, AND APPLICABLE LAW

10.    Asia Genius initiated this arbitration on the basis of Clause 27 of the T&C, which provides:

> "Any and all disputes, controversies and claims arising out of, involving, or relating to the Order shall be referred to, settled, and finally resolved exclusively by arbitration under the rules of the ICC International Court of Arbitration (the "Rules") by three arbitrators appointed in accordance with the Rules. All procedural matters arising in connection with any arbitration shall be resolved in accordance with the Rules. The Party commencing the arbitration shall appoint one arbitrator and the defendant Party shall appoint one arbitrator and a third arbitrator will be appointed by the two arbitrators appointed by the Parties, in accordance with the Rules. The existence of any dispute or the initiation or continuance of the arbitration proceedings shall not postpone, suspend, or delay the obligation of the Parties to perform or the performance by the Parties of their respective obligations pursuant to this Agreement. The payment of the costs and expenses of the arbitration will be determined by the arbitrators. The place of the arbitration shall be The Hague. The language used in the arbitral proceedings shall be English."

11.    Pursuant to Clause 27 of the T&C:

> i)    the place of arbitration shall be The Hague, the Netherlands; and
>
> ii)    the language of the arbitration is English.

12.    Given the place of arbitration (being The Hague, the Netherlands), the Dutch Arbitration Act as provided in Book IV of the DCCP is applicable as well as the Rules. Article 1054(2) DCCP provides that, if the parties have made a choice of law, the tribunal will decide the dispute in accordance with the rules of law designated by the parties.[1]

13.    Regarding the applicable substantive law, Asia Genius and Bariven have made a choice of law for the law of The Netherlands. Clause 25 of the T&C provides for the following:

> "The Order and all resulting or connected orders and/or agreements and all connected rights and obligations (including any claims based on tort) shall be governed by and construed in accordance with the law of The Netherlands."

---

[1]    Article 1054(2) of the DCCP provides: "*If a choice of law has been made by the parties, the arbitral tribunal shall decide in accordance with the rules of law designated by the parties. Failing such designation of law, the arbitral tribunal shall decide in accordance with the rules of law which it considers appropriate.*"

14.   The Parties did not expressly authorize the Tribunal to decide the dispute ex aequo et bono or as amiable compositeur as mentioned in Article 21(3) of the Rules. Pursuant to Article 1054(1) of the DCCP, the Tribunal shall make its Final Award in accordance with laws of the Netherlands, the Dutch Arbitration Act, and the Rules.[2]

## 5.   PROCEDURAL HISTORY

### A.   Commencement of the Arbitration

15.   On 23 December 2019, Claimant filed eight (8) Requests for Arbitration ("**RfAs**") in accordance with Article 4 of the Rules, together with exhibits C-01 through C-64 and legal authorities CL-01 through CL-06. In the RfAs, Claimant indicated that it appointed Mr. Eric Schwartz as arbitrator in accordance with the arbitration agreement. Claimant also filed a request for the consolidation of eight arbitrations pursuant to Article 10 of the Rules.

16.   The Secretariat acknowledged receipt of the RfAs and the request for consolidation on 30 December 2019, and after receipt of additional hardcopies, notified the RfAs to Respondent on 7 February 2020.

17.   On 27 February 2020, the Secretariat informed Claimant that the courier service in Venezuela had not yet confirmed the receipt to Respondent's address, and that notification of the RfAs to Respondent's agent's address in the Netherlands failed since *"the shipment was not delivered as the address is wrong"*. It invited Claimant to inform the Secretariat of an alternative address.

18.   On 4 March 2020, Claimant informed the Secretariat that it had made enquiries and confirmed PDVSA Services' registered address before the Dutch Chamber of Commerce to be at the President Kennedylaan 19, 2517 JK The Hague, the Netherlands. Claimant explained that that same address had also been stated in the requests for quotations ("**RfQs**") and the Purchase Orders ("**POs**") that gave rise to these arbitrations, that it had not been informed of any change in said address, and that therefore the notification was sent to PDVSA Services' last known address. Pursuant to Article 3(2) of the Rules, Claimant requested that PDVSA Services be deemed to have been notified of the RfAs.

19.   On 3 April 2020, the Secretariat confirmed, pursuant to Article 3(2) and 3(3) of the Rules, that the notification of the RfAs to PDVSA Services' address shall be deemed to have been made on 7 February 2020 (which was later corrected to 10 February 2020), and that no Answer had been received to date. It also informed Claimant that the courier service to Venezuela had informed the Secretariat that the shipment to Respondent's address in Venezuela was "*rejected for compliance reasons*". Moreover, the Secretariat referred to its general statement of 17 March 2020 in which the Secretariat advised that the RfAs can be filed by email and requested Claimant to indicate whether it would agree that the ICC notify the RfAs to Respondent by email, and in such case, to provide an email address of Respondent.

20.   On 17 April 2020, Claimant confirmed its agreement with the ICC's proposed notification of the RfAs to Respondent by email, and provided six email addresses for Respondent's representatives, without prejudice to the fact that the notification of the RfAs to PDVSA

---

[2]   Article 1054(1) of the DCCP provides: "*The arbitral tribunal shall decide in accordance with the rules of law.*"

Services' address in the Netherlands was deemed to have been made on 10 February 2020.

21. On 21 April 2020, Claimant informed the Secretariat of an additional email address for Respondent, as per the current registration with the Dutch Chamber of Commerce.

22. On 22 April 2020, the Secretariat acknowledged receipt of the email addresses for Respondent and announced that it would notify the RfAs to Respondent by email. On that same day the Secretariat sent a letter to Respondent's email addresses, notifying the RfAs (again).

23. On 24 April 2020, the Secretariat informed Claimant that delivery to all email addresses had failed but reminded that such notification was without prejudice to the fact that, pursuant to Article 3(2) and 3(3) of the Rules, the notification of the RfAs to PDVSA Services' address in the Netherlands was deemed to have been made on 10 February 2020.

24. On 1 May 2020, Claimant provided two fax numbers to the Secretariat and requested the Secretariat to notify the RfAs to Respondent by fax.

25. On 12 May 2020, the Secretariat informed Claimant that the attempted delivery to the provided fax numbers made on 7 May 2020 had also failed but again recalled that such notification was without prejudice to the fact that notification of the RfAs to PDVSA Services' postal address in the Netherlands was deemed to have been made on 10 February 2020.

26. On 19 May 2020, Claimant informed the Secretariat that on 4 May 2020 Claimant had been able to effect a notification in person of the RfAs to Respondent (including its annexes and all relevant correspondence from the Secretariat) at its registered offices in Caracas, Venezuela. Together with its letter Claimant provided a copy of the cover letter of this notification stamped as received on 4 May 2020 by Respondent, together with an affidavit produced and signed by the Venezuelan attorney who delivered the documents to Respondent on behalf of Claimant. Further, Claimant requested the Secretariat to transmit Claimants' RfAs to the Court for it to decide as soon as practicable on Claimant's request for consolidation pursuant to Article 10 of the Rules.

27. On 29 May 2020, the Secretariat invited Claimant to comment on whether the Secretariat should wait for the 30-day time limit from the in-person notification made by Claimant on 4 May 2020 to expire before inviting the Secretary General to take a decision pursuant to Article 6(3) of the Rules. It also informed Claimant that Claimant's request for consolidation would be transmitted to the Court in due course.

28. On 3 June 2020, Claimant confirmed that it did not object to the Secretariat waiting until the expiry of the 30-day time limit.

29. On 12 June 2020, upon the expiry of the 30-day time limit of the in-person notification of the RfAs to the Respondent, the Secretariat confirmed that, (i) pursuant to Article 6(3) of the Rules, if a party against which a claim has been made does not submit an Answer, the arbitration will proceed and the arbitral tribunal will decide any questions of jurisdiction or of whether the claims may be determined together, unless the Secretary General refers the matter to the Court, and (ii) that if a party refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such

refusal or failure (Article 6(3) Rules). In its letter, the Secretariat explained that the arbitrations had not been referred to the Court (Article 6(3) Rules) and that the arbitral tribunals will decide any questions of jurisdiction or of whether the claims may be determined together (Article 6(3) Rules), after providing the parties with an opportunity to comment.

### B.  Consolidation of the Arbitration

30.   By its letter of 12 June 2020, the Secretariat announced that it would invite the Court to examine Claimant's request to consolidate the eight (8) arbitrations.

31.   In its Session of 25 June 2020, the Court decided to consolidate the eight (8) arbitrations 25004/JPA, 25005/JPA, 25006/JPA, 25007/JPA, 25008/JPA, 25009/JPA, 25010/JPA and 25011/JPA into a single proceeding.

### C.  Constitution of the Tribunal

32.   On 17 August 2020, Claimant informed the Secretariat that Mr. Eric Schwartz, who had been nominated by Claimant in January 2020 by its RfAs, had recently indicated that he was unable to accept his nomination by Claimant to serve as arbitrator in this case.

33.   On 18 August 2020, Claimant nominated Ms. Judith Gill QC as arbitrator.

34.   On 19 August 2020, the Secretariat informed Mr. Paul Arrighi, that he was being considered for direct appointment by the Court as co-arbitrator on behalf of Respondent.

35.   On 1 September 2020, Claimant informed the Secretariat that Claimant withdrew the nomination of Ms. Gill and would shortly nominate another arbitrator in place of Ms. Gill.

36.   On 7 September 2020, Claimant nominated Ms. Nathalie Voser as arbitrator.

37.   On 22 September, the Secretariat (i) circulated Ms. Voser's Arbitration Statement, as well as the curriculum vitae, (ii) invited the Parties' comments on the disclosure, if any, and (iii) indicated that if a Party did not provide comments within the time limit granted, the Secretariat would consider that said Party does not object to Ms. Voser's confirmation.

38.   No comments were received within the granted time limit, or thereafter.

39.   On 22 October 2020, the Court confirmed Ms. Nathalie Voser as co-arbitrator upon Claimant's nomination (Article 13(1) Rules) and directly appointed Mr. Paul Arrighi as co-arbitrator on behalf of Respondent (Article 13(4)(a) Rules).

40.   On 18 November 2020, the two co-arbitrators jointly nominated Ms. Bregje Korthals Altes to be the President of the Tribunal.

41.   On 23 December 2020, Ms. Bregje Korthals Altes was confirmed as President of the Tribunal by the Secretary General upon joint nomination by the co-arbitrators. Pursuant to Article 16 of the Rules the file was transmitted to the Tribunal on that same day.

### D. Compliance discussions and Terms of Reference

42.    On 14 January 2021, the Tribunal informed the Parties that, because of the US Venezuela-related sanctions régime, which expressly includes the PDVSA-group in the prohibition of transactions involving Venezuelan parties, the ICC's banks had refused to accept and process the provisional advance on costs of the arbitration to be paid by the Parties, and that as a consequence of this refusal, the ICC's capacity to administer these arbitration proceedings was at risk as well. The Tribunal announced that it would enter into consultations with the Secretariat and the ICC's Compliance Team to explore possible solutions and invited the Parties to share their views in this regard.

43.    For more than a year - from January 2021 until February 2022 - the Tribunal liaised directly with the ICC's Compliance Team to explore further possible solutions, however, without success.

44.    Parallel to the discussions referenced above, the Tribunal, by letter of 2 February 2021, informed the Parties that while discussing possible solutions, the Tribunal wished to proceed with the issuance of the Terms of Reference and invited the Parties to submit a summary of their respective claims and the relief sought. Although multiple reminders were sent by emails of 19 February 2021, 23 February 2021, and 25 February 2021, no response was received from Respondent.

45.    By email of 24 February 2021 the Secretariat informed the Parties and the Tribunal that at its session of 18 February 2021 the Court extended the time limit for establishing the Terms of Reference until 31 March 2021 pursuant to Article 23(2) of the Rules.

46.    By email of 2 March 2021, the draft of the Terms of Reference was shared with the Parties.

47.    At its session of 18 March 2021, the Court extended the time limit for establishing the Terms of Reference until 30 April 2021. On 30 March 2021, following consultation with the Claimant, the Tribunal circulated a final version of the Terms of Reference to be signed by the Parties. The Terms of Reference were signed by Claimant on 30 March 2021.

48.    At its session of 15 April 2021, the Court further extended the time limit for establishing the Terms of Reference until 31 May 2021. The Terms of Reference were subsequently signed by the members of the Tribunal on 17 April 2021 and 19 April 2021.

49.    In the absence of approval by Respondent, the Tribunal submitted the Terms of Reference to the Court in accordance with Article 23(3) of the Rules. On 29 April 2021, the Court approved the Terms of Reference.

50.    At is session of 21 October 2021 the time limit for rendering the Final Award was extended by the Court to 31 January 2022.

51.    On 9 December 2021, the Court fixed the advance on costs at EUR 570,000[3] subject to later readjustments (Article 37(2) Rules).

---

[3] In this Final Award the US-notation is used for all amounts (both for EUR and USD).

52.  At its session of 20 January 2022, the Court extended the deadline for the rendering of the Final Award to 29 April 2022.

53.  On 14 February 2022, the ICC Compliance Team informed the Tribunal and the Parties that it had recently received a confirmation from one of its banks that it would be able to open a specific ICC account to receive the advance on costs in the present arbitration. The basis for, and condition attached to, the bank's confirmation and willingness to set up a designated ICC bank account was that (i) the ICC had recently been granted a specific license by the US Office of Foreign Assets Control (OFAC) for the administration of cases involving Iran and had subsequently applied for a second specific license covering other US sanctions programs (including those against Venezuela) and (ii) payment of all arbitration costs would be exclusively made by the Party that was not subject to direct or indirect US sanctions. Further, it was made clear that any payments or potential reimbursement from the ICC's specific account would only be released to the arbitral tribunal or to the non-sanctioned Party, and that no payments to sanctioned parties would be processed until OFAC would grant an ICC specific license for Venezuela. In any case, the ICC Compliance Team added that any payment would only be processed after comprehensive verifications.

54.  On 18 February 2022, the Secretariat invited Claimant to pay the advance of costs to the designated ICC bank account.

55.  On 23 March 2022, Claimant provided payment confirmation of EUR 570,000 to the designated ICC bank account for the full advance on costs.

56.  On 24 March 2022, the Secretariat informed the Tribunal and the Parties that it would revert as soon as the financial department of the ICC had confirmed receipt of the funds.

57.  At is session of 21 April 2022, the Court extended the time limit for the rendering of the Final Award until 29 July 2022.

58.  On 10 June 2022, the Secretariat confirmed receipt of the payment of the advance on costs by Claimant.

**E.  Conduct of the Arbitration**

59.  By email of 17 June 2022, the Tribunal informed the Parties that – as the ICC had received the advance on costs – it wished to proceed with the arbitration without further delay. The Tribunal indicated that it would circulate a draft Procedural Order No. 1 and requested the Parties to share a proposal for the Procedural Timetable.  Further, the Tribunal informed the Parties that it intended to appoint Ms. Hanneke Schreur as administrative secretary and would proceed with such appointment if no objections from the Parties were received.  Ms. Schreur's CV was also shared with the Parties, as an attachment to the email.

60.  On 24 June 2022, Claimant provided a draft Procedural Timetable to the Tribunal. Claimant therein proposed that since Respondent had not submitted an Answer to the RfAs, the Claimant's RfAs stand as its Statement of Claim.

61.  On 5 July 2022, the Tribunal circulated a draft Procedural Order No. 1 including the procedural timetable to the Parties. The Tribunal indicated its preference for the Claimant to file a separate Statement of Claim, in which Claimant should also address the

11

jurisdiction of the Tribunal, taking into consideration Section 67 of the Terms of Reference. The Tribunal also proposed to hold a procedural call to discuss Procedural Order No. 1, as well as additional safeguards in view of Respondent's lack of participation in the arbitration proceedings. The Tribunal explicitly invited Respondent to participate in the procedural call and to submit a Statement of Defence.

62. A case management conference was held on 11 July 2022 pursuant to Article 24 of the Rules. Respondent did not participate.

63. On 18 July 2022, and following further consultation with Claimant, the Tribunal established Procedural Order No. 1. On 19 July 2022, the Tribunal circulated a revised version of this Procedural Order with minor corrections. The Procedural Order provided that Claimant would be required to demonstrate to the Tribunal that Procedural Order No. 1 and the Statement of Claim have been sent by registered mail or courier to both Respondent's and PDVSA Services' registered office address (Section 2.3 of Procedural Order No. 1).

64. On 21 July 2022, the Court extended the time limit for rendering the Final Award until 29 September 2023 (Article 32(2) Rules).

65. On 8 August 2022, the Tribunal requested the Court to grant the members of the Tribunal an advance on fees.

66. On 12 August 2022, Claimant submitted its Statement of Claim, together with exhibit C-27bis and legal authorities CL-6bis and CL-13 through CL-17, in accordance with the Procedural Timetable.

67. On 9 September 2022, Claimant updated the Tribunal on its notification of Procedural Order No. 1 and the SoC to Respondent and PDVSA Services. Claimant provided confirmation that Procedural Order No. 1 and the SoC were sent by private courier to Respondent's registered office address in Caracas, Venezuela, and that such notification was received by Respondent on 18 August 2022 (with stamped proof of delivery). Claimant also informed the Tribunal of the various efforts it undertook to notify Procedural Order No. 1 and the SoC to PDVSA Services. Claimant informed the Tribunal that it had learned that PDVSA Services no longer holds an establishment in the Netherlands and has a new address in Venezuela. Whilst the private courier could not notify the documents to PDVSA Services in person there either, as the Venezuelan address is located within a gated community, to which access is not allowed without authorization, Claimant sent copies of the documents through Venezuela's public courier service IPOSTEL to PDVSA Services' address in Venezuela on 1 September 2022. This courier service does not provide track-and-trace services. Claimant requested the Tribunal to confirm that Claimant was deemed to have complied with its notification obligations under Section 2.3 of Procedural Order No. 1 and Article 3 of the Rules.

68. On 25 September 2022, the Secretariat confirmed that the ICC would execute payment of the advance on fees to the members of the Tribunal.

69. On 12 October 2022, the Tribunal confirmed that Claimant had complied with Section 2.3 of Procedural Order No. 1.

70.    Pursuant to Section 2.1 of Procedural Order No. 1, Respondent was due to file its Statement of Defence by no later than 10 November 2022. The Tribunal did not receive a Statement of Defence on or before 10 November 2022.

71.    On 14 November 2022, Claimant requested that – in light of Respondent not having submitted its statement of Defence pursuant to Procedural Order 1 – the Tribunal issue its award in the arbitration. Claimant also requested that it be given the opportunity to make a costs submission prior to the rendering of the award.

72.    On 16 November 2022, the Tribunal confirmed receipt of Claimant's email of 14 November 2022 and noted that it had not received a Statement of Defence from Respondent. The Tribunal indicated that it would revert on the next steps in the arbitration after receipt of the advance on fees to the members of the Tribunal.

73.    On 22 and 23 November 2022, the members of the Tribunal received the advance on fees.

74.    On 8 December 2022, the Tribunal informed the Parties that it understood from Claimant's request in its letter of 14 November 2022 that it did not consider a hearing to be necessary. The Tribunal indicated that it also did not consider a hearing to be necessary. At the same time, the Tribunal requested Claimant to provide certain clarifications regarding some factual issues in the Statement of Claim and to submit additional exhibits.

75.    On 16 December 2022, Claimant responded to the Tribunal's request for clarifications and resubmitted Exhibits C-29 and C-32 and submitted as new exhibits, Exhibit C-65 and C-66.

76.    On 10 January 2023, the Tribunal expressed its intention to close the proceedings in accordance with Article 27 of the Rules and requested Claimant to submit its costs submissions by no later than 23 January 2023.

77.    On 23 January 2023, Claimant filed its submission on costs, together with exhibit C-01bis and C-67 and legal authorities CL-18 through CL-23. On 24 January 2023, the Tribunal requested Claimant to provide an overview of the actual time spent per attorney of Dechamps International Law and the invoices related to the legal fees. By letter of 31 January 2023 (including Annex A and B), Claimant provided the requested documentation.

78.    On 17 February 2023, the Tribunal closed the proceedings, pursuant to Article 27 of the Rules.

## 6.    FACTUAL BACKGROUND

79.    This Section seeks to present a brief background to the dispute by providing a general overview of the facts, insofar as they are essential for the Tribunal's determination of the issues decided in this Final Award and sufficiently established (or insufficiently disputed). This factual summary is based on the documentary evidence on the record and the written submissions in the arbitration.

### A. Issuance of Purchase Orders

80. The commercial relationship between Asia Genius and Bariven relevant to this arbitration relates to the issuance and subsequent performance of nine purchase orders in the period from April 2012 to April 2014. The POs were issued by PDVSA Services, on behalf of Bariven, and relate to the sale and delivery of equipment for construction works and for the oil industry by Asia Genius to Bariven.[4]

81. The process leading up to the issuance of the nine POs was the same for each PO. Shortly summarised:[5]

   i) PDVSA Services would issue a RfQ to potential suppliers, including Asia Genius, for the purchase and supply of materials. The RfQs included the T&C, which would govern the relationship between the seller and the buyer.

   ii) Asia Genius would submit a quotation in response to the RfQ.

   iii) If PDVSA Services selected Asia Genius' quotation, it would issue a PO relating to the materials. The PO provided the specifications for the purchased goods, the purchase price, certain packing and shipping instructions and referenced the T&C. The PO indicated that the supplier should provide an acknowledgement of the PO within 48 hours. Six of the nine POs also added that if the supplier fails to provide a PO acknowledgement within 48 hours, then such PO shall nevertheless be deemed accepted.[6]

   iv) Asia Genius would then provide an acknowledgement of the PO.

82. For each PO, Asia Genius has exhibited the RfQ (including the T&C) and the PO in this arbitration:

   i) The RfQs have been submitted as:

   - Exhibit C-03: RfQ in relation to PO 1 dated 27 April 2012;
   - Exhibit C-04: RfQ in relation to PO 2 dated 27 April 2012;
   - Exhibit C-05: RfQ in relation to PO 3 dated 27 April 2012;
   - Exhibit C-06: RfQ in relation to PO 4 dated 27 April 2012;
   - Exhibit C-13: RfQ in relation to PO 5 dated 3 September 2012;
   - Exhibit C-16: RfQ in relation to PO 6 dated 16 October 2012;
   - Exhibit C-14: RfQ in relation to PO 7 dated 6 September 2012; and
   - Exhibit C-15: RfQ in relation PO 8 and PO 9 dated 20 September 2012.

   ii) The POs have been submitted as:

   - Exhibit C-08: PO 1 dated 12 June 2012;
   - Exhibit C-09: PO 2 dated 12 June 2012;
   - Exhibit C-10: PO 3 dated 12 June 2012;
   - Exhibit C-11: PO 4 dated 25 June 2012;
   - Exhibit C-18: PO 5 dated 12 November 2012;
   - Exhibit C-19: PO 6 dated 30 November 2012;

---

[4] RfA, para. 3.
[5] SoC, para. 7(i)-(vii); RfA, para. 20.
[6] This is included in PO 1, PO 4, PO 5, PO 6, PO 8 and PO 9. It is not included in PO 2, PO 3 and PO 7.

- Exhibit C-23: PO 7 dated 18 January 2013;
- Exhibit C-25: PO 8 dated 24 April 2013; and
- Exhibit C-26: PO 9 dated 25 April 2013.

83. In addition, and only in relation to PO 1, Asia Genius has also submitted:

- Exhibit C-07: the quotation submitted by Asia Genius in response to the RfQ for PO 1 dated 23 May 2012; and
- Exhibit C-12: the acknowledgement of PO 1 submitted by Asia Genius to PDVSA Services dated 10 July 2012.

### B. Delivery of materials ordered under the POs

84. Following acknowledgement of the PO, Asia Genius would arrange delivery of the materials ordered. For certain POs, the delivery occurred in parts. The delivery occurred in accordance with the following process:[7]

i)     Asia Genius would coordinate the logistics with PDVSA Services and Bariven.

ii)    PDVSA Services would hire an inspection company to inspect the products prior to delivery. Upon review and approval, the inspection company would issue an inspection release note.

iii)   For each (partial) delivery, Asia Genius would provide Bariven with the packing lists detailing the materials included in the delivery.

iv)    Asia Genius would make the materials available to PDVSA Services' carrier at the agreed place of delivery and would provide Bariven with a copy of all transaction documents.

v)     Bariven would provide Asia Genius with a numbered confirmation referred to as "Goods Received" confirming receipt of goods.

85. Only in relation to PO 1, Asia Genius has submitted:

- Exhibit C-20: the inspection release note from Bureau Veritas in relation to the materials ordered pursuant to PO 1 dated 26 December 2012;
- Exhibit C-22: the packing list detailing the materials to be delivered pursuant to PO 1 dated 7 January 2013; and
- Exhibit C-24: an email from DHL to Asia Genius dated 6 February 2013 providing the "GR" (goods received) code in respect of PO 1.

### C. Issuance and payment of invoices

86. Asia Genius issued invoices corresponding to the PO around the date of inspection. For POs that would be delivered in parts, Asia Genius would issue an invoice for each partial delivery.[8]

---

[7]     SoC, para. 7(ix)-(xiii).
[8]     SoC, para. 7(xi).

87. In certain cases, Asia Genius requested an advance payment of 30% of the purchase price. If approved, Asia Genius would issue a separate invoice for the advance payment.[9] Bariven approved advance payments of 30% for PO 1, PO 2, PO 3, and PO 4.[10]

88. Pursuant to the T&C (Clause 4(II)), Bariven was obligated to issue payment within 30 days following receipt by PDVSA Services of a correct and conforming vendor invoice.

89. Asia Genius states that Bariven paid a small portion of the amounts owed under the outstanding invoices, but that Bariven failed to pay, in part or in full, thirty approved invoices.[11] The payments made by Bariven include:

   (i)   payment of the advance payments for PO 1, PO 2, PO 3 and PO 4;[12]

   (ii)  a payment of USD 888,683.14 in respect of PO 5;[13]

   (iii) a payment of USD 1,300,000 in respect of PO 6;[14] and

   (iv)  a payment of USD 600,000 in respect of PO 6.[15]

90. In addition, Bariven held a credit against Asia Genius in the amount of USD 800,000 as a consequence of overpaying Asia Genius in an unrelated transaction.[16]

91. In this arbitration, Asia Genius has submitted thirty (30) invoices relating to payments that it states are outstanding. The below table provides an overview of the outstanding invoices filed by Asia Genius, as well as the payments made, and credit held, by Bariven:

| No. | Invoice No. | Amount | Date | Exhibit No. |
|---|---|---|---|---|
| **Purchase Order 1** | | | | |
| 1. | AG-100031 | USD 2,373,000 | 3 January 2013 | Exhibit C-35 |
| | **Total** | **USD 2,373,000** | | |
| **Purchase Order 2** | | | | |
| 2. | AG-100011 | USD 3,020,346 | 18 October 2012 | Exhibit C-17, C-36 |
| 3. | AG-100018 | USD 1,632,120 | 26 November 2012 | Exhibit C-37 |
| 4. | AG-100025 | USD 1,834,728 | 18 December 2012 | Exhibit C-38 |
| 5. | AG-100041* | USD 1,601,166 | 4 March 2013 | Exhibit C-39 |
| | **Total** | **USD 8,088,360** | | |
| **Purchase Order 3** | | | | |
| 6. | AG-100032 | USD 1,272,600 | 3 January 2013 | Exhibit C-40 |

---

9    SoC, para. 7(vii).
10   Exhibit C-33: *see* (i) the email of Bariven dated 4 July 2012 in respect of PO 1 (p. 1); (ii) the email of Bariven dated 3 August 2012 in respect of PO 2 (p. 3); (iii) the email of Bariven dated 10 July 2012 in respect of PO 3 (p. 9); and (iv) the email of Bariven dated 17 July 2012 in respect of PO 4 (p. 11).
11   SoC, para. 9-10.
12   SoC, footnote 21.
13   SoC, footnote 64.
14   SoC, footnote 65.
15   SoC, footnote 66.
16   SoC, para. 32.

| No. | Invoice No. | Amount | Date | Exhibit No. |
|---|---|---|---|---|
| | **Total** | **USD 1,272,600** | | |
| **Purchase Order 4** | | | | |
| 7. | AG-100020 | USD 553,896 | 29 November 2012 | Exhibit C-41 |
| 8. | AG-100021* | USD 415,422 | 6 December 2012 | Exhibit C-42 |
| 9. | AG-100022 | USD 725,088 | 12 December 2012 | Exhibit C-43 |
| 10. | AG-100026 | USD 789,301.80 | 18 December 2012 | Exhibit C-44 |
| 11. | AG-100027 | USD 725,088 | 18 December 2012 | Exhibit C-45 |
| 12. | AG-100029 | USD 725,088 | 3 January 2013 | Exhibit C-46 |
| 13. | AG-100030 | USD 435,052.80 | 3 January 2013 | Exhibit C-47 |
| 14. | AG-100033 | USD 435,052.80 | 4 January 2013 | Exhibit C-48 |
| 15. | AG-100036 | USD 870,105.60 | 15 January 2013 | Exhibit C-49 |
| 16. | AG-100038 | USD 580,070.40 | 29 January 2013 | Exhibit C-50 |
| 17. | AG-100039* | USD 1,305,158.40 | 6 February 2013 | Exhibit C-51 |
| 18. | AG-100042 | USD 579,977.22 | 11 March 2013 | Exhibit C-52 |
| 19. | AG-100043 | USD 580,070.40 | 1 April 2013 | Exhibit C-53 |
| 20. | AG-100044 | USD 580,070.40 | 1 April 2013 | Exhibit C-54 |
| 21. | AG-100046 | USD 580,070.40 | 22 April 2013 | Exhibit C-55 |
| 22. | AG-100049* | USD 623,575.68 | 26 April 2013 | Exhibit C-56 |
| | **Total** | **USD 10,503,087.90** | | |
| **Purchase Order 5** | | | | |
| 23. | AG-100050 | USD 1,708,000 | 2 May 2013 | Exhibit C-57 |
| *Paid by Bariven*[17] | | - USD 888,683.14 | | |
| | **Total** | **USD 819,316.86** | | |
| **Purchase Order 6** | | | | |
| 24. | AG-100051* | USD 4,775,599.30 | 3 May 2013 | Exhibit C-58 |
| *Paid by Bariven*[18] | | - USD 1,300,000 | | |
| 25. | AG-100055 | USD 7,084,524.45 | 19 June 2013 | Exhibit C-59 |
| *Paid by Bariven*[19] | | - USD 600,000 | | |
| 26. | AG-100053 | USD 2,393,220.53 | 12 June 2013 | Exhibit C-60 |

---

[17]    SoC, footnote 64.
[18]    SoC, footnote 65.
[19]    SoC, footnote 66.

| No. | Invoice No. | Amount | Date | Exhibit No. |
|---|---|---|---|---|
| 27. | AG-100060* | USD 24,061.68 | 25 July 2013 | Exhibit C-61 |
| | **Total** | **USD 12,377,405.96** | | |
| **Purchase Order 7** | | | | |
| 28. | AG-100048* | USD 5,822,952.42 | 26 April 2013 | Exhibit C-62 |
| | **Total** | **USD 5,822,952.42** | | |
| **Purchase Order 8** | | | | |
| 29. | AG-100065 | USD 8,966,400 | 6 December 2013 | Exhibit C-63 |
| | **Total** | **USD 8,966,400** | | |
| **Purchase Order 9** | | | | |
| 30. | AG-100064* | USD 247,558 | 4 December 2013 | Exhibit C-64 |
| | **Total** | **USD 247,558** | | |
| | | | | |
| All outstanding invoices | USD 50,470,581.14 | | | |
| *Credit held by Bariven* | - USD 800,000 | | | |
| **Total outstanding** | **USD 49,670,681.14** | | | |

92.   Claimant has provided an overview of the invoices, including the date of the invoice, in paragraph 36 of the RfA and Exhibit 34. The Tribunal notes that for eight of the invoices, the date of the invoice included in the overviews provided by Claimant does not correlate to the date on the corresponding invoice. This relates to the invoices marked with an asterisk (*) in the above table.[20] The table above includes the dates as stated on the actual invoice and will be the dates used by the Tribunal in this Final Award.

   **D.   Correspondence on invoices**

93.   On 12 February 2015 (08:56), Ana Diaz of Bariven sent an email to Carmen Useche of Asia Genius and indicated that she had reviewed the case and that one of the payments made by Bariven to Asia Genius had not been deducted in the overall accounts.[21] This payment amounted to USD 800,000 and would be deducted by Bariven in its next payment.

94.   In the above email, Bariven also noted that the outstanding debt of Bariven to Asia Genius amounted to USD 49,675,479.64:[22]

> "Regarding the debt, we have registered in our system an outstanding amount of US$ 49.675.479,64 – already deducting US$ 800.000. However, we have a small difference with US$ 50.475.479.
>
> I will send you the full statement of account for your review by separate email."

---

[20]   Invoices AG-100041, AG-100021, AG-100039, AG-100049, AG-100051, AG-100060, AG-100048, AG-100064.
[21]   Exhibit C-32 (resubmitted with English translation).
[22]   Exhibit C-32 (resubmitted with English translation).

95. On the same day, 12 February 2015 (14:26), Ana Diaz of Bariven sent Asia Genius an email stating "[p]*lease find attached the statement of account.*[23] The email included an attachment titled "Vendor Line Item Display.HTM".[24] The attachment is a spreadsheet, which lists all Asia Genius' invoices, and indicates in Spanish that they have been "Aprobada", which means approved.  It shows negative numbers for all amounts that are due and positive numbers for the payments made by Bariven. The bottom of the spreadsheet notes the sum of all the amounts, namely - USD 49,675,479.64.

96. On 18 July 2017, Sonia Meza from the PDVSA Services legal department sent an email to Leonardo Britto of Afiens, a legal service provider.[25] In her email, Sonia Meza referenced a meeting that was held on 5 July 2017, and stated:[26]

> "- We acknowledge receipt of the two suppliers' claims, Asian *[sic]* Genius Investments Limited [REDACTED]
>
> - So far, we have detected no discrepancies between the claims and the information in our system, but this does not mean that there might not be any discrepancy or any failure in the procurement processes. We will continue to investigate on this matter.
>
> - As of now, we request a one-month extension to request funds from end users and to obtain a payment commitment."

97. On 10 November 2017, Counsel at Pels Rijcken & Drooglever Fortuijn ("**Pels Rijcken**"), on behalf of Asia Genius, sent a letter to Bariven and PDVSA Services.[27] In the letter, Pels Rijcken noted that the invoices relating to the POs had been approved by Bariven, were all due and payable and amounted to a total of USD 49,675,479.64. The letter attached an overview of all outstanding invoices and corresponding amounts. Further, counsel informed Bariven and PDVSA Services:

> "We have been instructed to file a Request of Arbitration with the International Chamber of Commerce in order to obtain an enforceable arbitrational award for payment of the invoices against Bariven. Unless you confirm in writing that the outstanding amounts will be paid within 30 days from now or that you are ready to start serious discussions about how the invoices can be paid within a reasonable amount of time, we will file such Request shortly.
>
> This letter is an act of interruption of any limitation period (Section 3:317 Dutch Civil Code)."

## 7.    OVERVIEW OF CLAIMANT'S POSITION

98. Claimant brings its claims under the T&C, which according to Asia Genius, govern the nine separate POs, under which Bariven purchased various goods that were subsequently delivered by Asia Genius.

99. First, Asia Genius says that, whilst the T&C require Bariven to pay in full within 30 days from the date PDVSA Services has received Asia Genius' invoices[28], Bariven has been

---

[23]    Exhibit C-29 (resubmitted with English translation); Exhibit C-65.
[24]    Exhibit C-28.
[25]    Exhibit C-66.
[26]    Exhibit C-66.
[27]    Exhibit C-30.
[28]    SoC, para. 25.

negligent in paying most of Asia Genius' invoices, for a total shortfall of USD 50,470,681.14.[29]

100. According to Asia Genius, Bariven did not voice any objections or concerns regarding the timelines of delivery, the conformity of the goods delivered or any other aspect of Asia Genius' performance of the POs.[30] And, Asia Genius adds, none of the scenarios that would have allowed Bariven to withhold payment listed in Clause 4(III) of the T&C[31] occurred, and none was invoked by Bariven to avoid its payment obligations.[32]

101. To the contrary, Asia Genius argues, Bariven even acknowledged its debt towards Asia Genius, when on 12 February 2015 Bariven sent an email to Asia Genius, confirming that the outstanding invoices had been approved and that Bariven did not contest the outstanding amounts.[33]

102. It follows from the above, says Asia Genius, that Bariven was in default of its payment obligation after the 30-day payment period had passed. Since the payment obligation was subject to a time stipulation, there was no need to send a letter of formal notice pursuant to Article 6:82 of the DCC.[34] Nevertheless, Asia Genius points out that it requested payment from Bariven and in doing so put Respondent on formal notice (in Dutch: *ingebrekestelling*) with its letter of 10 November 2017 referenced above in paragraph 97.[35]

103. Second, Asia Genius argues that according to Article 3:305 jo. 3:296 of the DCC,[36] Asia Genius is entitled to request an arbitral tribunal to order Bariven's specific performance under the contract.[37] On this basis, Asia Genius claims to be entitled to payment by Bariven of a total amount (before interest) of USD 49,670,681.14 (taking into account the credit of USD 800,000 that Bariven holds against Asia Genius).[38] Asia Genius adds

---

[29]  SoC, para. 10.
[30]  RfA, para. 22.
[31]  Clause 4(III) of the T&C provides: "*III. The Buyer may withhold payment in the event any of the following occur:*
   a) *Vendor is in material default under any terms or conditions of the Order including delivery schedule;*
   b) *Unresolved claims for damage to the Buyer Group or any End User or claims against the Materials by any Vendors suppliers or subcontractors;*
   c) *Failure of Vendor to provide satisfactory supporting documentation including, but not limited to, invoices for Materials, delivery receipts, cargo manifest and progress reports;*
   d) *The invoice amount significantly exceeds the consideration specified in the Order.*"
[32]  RfA, para. 27.
[33]  SoC, para. 11.
[34]  Article 6:82 of the DCC provides: "*1. Default shall commence when the debtor is given written notice of default granting him a reasonable period for the performance and there is no performance within such period. 2. If a debtor is temporarily unable to perform or if it is evident from his attitude that a warning would serve no purpose, he may be put into default by a written notice to the effect that he is held liable for his non-performance.*"
[35]  SoC, paras. 25 and 29.
[36]  Article 3:305 of the DCC provides: "*Unless the parties have otherwise agreed, arbitrators shall exercise the same powers as those conferred on the court in the preceding articles of this Title.*"
   Article 3:296 of the DCC provides: "*1. Unless it otherwise follows from the law, the nature of the obligation or a juridical act, the person obliged to give, to do or not to do something as regards another may be ordered to do so by the court upon the demand of the person to whom the obligation is owed.*
   *2. Where the obligation is subject to a condition or a term, the court may order its performance subject to that condition or term.*"
[37]  SoC, para. 26, RfA para 30.
[38]  SoC, para. 32, this is taking into account that Bariven overpaid Asia Genus overpaid USS 800,000 in an unrelated transaction. This amount is credited against the amount claimed by Asia Genius (i.e., USD 50,470,681.14 - USD 800,000).

that pursuant to Article 6:119a of the DCC,[39] to this amount, the statutory interest for commercial transactions should be added, from one day after the expiry date for payment of the relevant invoices until the day of effective payment and compounded on a yearly basis.[40]

104. Third, Asia Genius says that the five-year prescription period of Article 3:307 of the DCC for the right of action to claim performance of a contractual obligation was interrupted at various moments in time.[41] First, by Bariven's recognition on 12 February 2015 of all outstanding invoices. Second, with the letter of formal notice sent by Asia Genius to Bariven through PDVSA Services of 10 November 2017. And third, with the filing of the RfAs on 23 December 2019.[42]

105. Therefore, Asia Genius submits, its assertion of its claims in the arbitration is timely and the Tribunal also has jurisdiction to decide on the claims. According to Asia Genius, the jurisdiction arises from Clause 27 of the T&C. Asia Genius highlights that the Dutch Supreme Court has confirmed that arbitration agreements included in standard terms and conditions are valid where the parties to the agreement are (i) professional parties; (ii) refer to the standard terms in their exchanges; and (iii) do not object to their application.[43] It is Asia Genius' position that all these conditions have been met and other arbitral tribunals have also issued awards upholding jurisdiction over claims against Bariven arising from the same T&C.[44] As a result, Asia Genius argues, the arbitration agreement is valid, and the Tribunal has jurisdiction over the dispute.[45]

## 8.  RELIEF SOUGHT

106. Based on the above, in the Statement of Claim, Asia Genius requests the Tribunal to:

(i)    DECLARE that is has jurisdiction to decide these disputes;

(ii)   DECLARE that Bariven breached its contractual obligations towards Asia Genius under Dutch law;

---

[39]  Article 6:119a(1) of the DCC provides: "*1. The damages due on account of a delay in payment of a sum of money shall, in the case of a commercial agreement, consist of statutory interest over such sum as from the date following the date agreed upon as final payment date until and including the date of the actual payment of that sum by the debtor. A 'commercial agreement' means an agreement for value pursuant to which one or more parties must give or do something and which is made by and between one or more natural persons acting in the conduct of a profession or business, or by and between legal persons.*"
[40]  SoC, para. 33.
[41]  Article 3:307 of the DCC provides:
"*1. A right of action to claim the performance of a contractual obligation to give or to do something becomes prescribed on the expiry of five years from the day following the one on which the debt-claim has become due and demandable (exigible).
2. Where it concerns an obligation to perform after an indefinite moment, the period referred to in paragraph (1) runs from the day following the one on which the creditor has notified the debtor that he demands performance, while the right of action meant in paragraph (1) in any event become prescribed on the expiry of twenty years from the day following the one on which the debt-claim became due and demandable (exigible) for the first time, if need be after a termination by the creditor.*"
[42]  RfA, para. 32-35, and Exhibit C-30.
[43]  SoC, para. 16 with reference to Supreme Court of the Netherlands, ECLI:NL:HR:2011:BT6684, 2 December 2011. Exhibit CL-13.
[44]  SoC, para. 18-19.
[45]  SoC, para. 20.

21

    (iii)      ORDER Bariven to pay the Claimant the total outstanding principal amount of USD 49,670,681.14 or such other amount that the Tribunal deems appropriate;

    (iv)      ORDER Bariven to pay statutory commercial interest on the amounts due calculated in accordance with Article 6:119a of the DCC from 30 days of the receipt of each unpaid invoice as per the breakdown in paragraph 36 of the Statement of Claim, or from such other time the Tribunal deems fit, until effective payment;

    (v)      ORDER Bariven to pay all costs and fees of the Arbitrations, including the administrative fees and costs of the ICC, the fees, and expenses of the Tribunal and of any experts appointed by it, and the Claimant's legal and other costs in these proceedings, with interest; and

    (vi)      AWARD any other or further relief that the Tribunal may consider appropriate.

107.    In its submission on costs dated 23 January 2023, Claimant slightly revised the wording of parts of its relief, without changing the substance of its claims. In the submission on costs, Asia Genius requests the Tribunal to render an award:

    (a)      ORDERING Bariven to pay the Claimant **US$ 49,670,681.14** as a result of Bariven's breach of its contractual obligations towards the Claimant and Dutch law;

    (b)      ORDERING Bariven to pay the Claimant the applicable pre-award statutory commercial interest (capitalized annually) on the Claimant's unpaid invoices, as provided in Article 6:119a of the Dutch Civil Code, which, as of the date of this submission amount to **US$ 56,924,990.63** for an aggregate claimed amount of **US$ 106,595,671.77**;

    (c)      ORDERING Bariven to pay the Claimant post-award statutory commercial interest (capitalized annually) as provided in Article 6:119a of the Dutch Civil Code on the amounts in bullets (a) and (b) above starting from the date of the Tribunal's award until the date of full and final payment;

    (d)      ORDERING Bariven to reimburse all costs of the arbitration that have been incurred by the Claimant, in the amount of **US$ 1,352,739.92** and **EUR 570,000.00**;

    (e)      ORDERING Bariven to pay the Claimant post-award statutory interest (capitalized annually) as provided in Article 6:119 of the Dutch Civil Code, on the amounts in bullet (d) above starting from the date of the Tribunal's award until the date of full and final payment; and

    (f)      CONCEDING any other reparatory measures that the Tribunal deems appropriate.

## 9.    JURISDICTION

108.    In accordance with Claimant's request referenced above under paragraph 106(i), the Tribunal will first assess its jurisdiction. In any event, in absence of Bariven appearing in these proceedings, the Tribunal would have to assess its jurisidiction *ex officio*, as is

required under Dutch arbitration law[46], as well Article 6(3) of the Rules and Section 67 of the Terms of Reference.

### A. Background

109. Asia Genius initiated this arbitration on the basis of Clause 27 of the T&C, which provides:

> "Any and all disputes, controversies and claims arising out of, involving, or relating to the Order shall be referred to, settled, and finally resolved exclusively by arbitration under the rules of the ICC International Court of Arbitration (the "Rules") by three arbitrators appointed in accordance with the Rules. All procedural matters arising in connection with any arbitration shall be resolved in accordance with the Rules. The Party commencing the arbitration shall appoint one arbitrator and the defendant Party shall appoint one arbitrator and a third arbitrator will be appointed by the two arbitrators appointed by the Parties, in accordance with the Rules. The existence of any dispute or the initiation or continuance of the arbitration proceedings shall not postpone, suspend, or delay the obligation of the Parties to perform or the performance by the Parties of their respective obligations pursuant to this Agreement. The payment of the costs and expenses of the arbitration will be determined by the arbitrators. The place of the arbitration shall be The Hague. The language used in the arbitral proceedings shall be English."

110. As stated above, the dispute in this arbitration relates to the payment of invoices in connection with nine POs that were issued by PDVSA Services, on behalf of Bariven, to Asia Genius. Each of the POs refers to the T&C and indicates that the T&C are an integral part of the PO:[47]

> "This purchase order is issued by PDVSA Services, BV on behalf of, and for the account of BARIVEN S.A. and is subject to the PDVSA Services, BV Standard Terms and Conditions (Rev. 08-2009) for goods; or PDVSA Services, BV Standards Terms and Conditions (Revision 00-2009) for Services; hereinafter referred to as T&Cs, with the amendments and modifications as agreed upon between vendor and buyer. These T&Cs are an integral part of this purchase order and are already in your possession. In the event that you do not have these T&Cs, please advise us. Acceptance of this purchase order signifies your acknowledgment, understanding, and acceptance of said Terms and Conditions."

111. The T&C were not included with the POs but had been included with the RfQs that preceded the issuance of the POs.

### B. Applicable law

112. Clause 27 of the T&C provides that the place of arbitration shall be The Hague, The Netherlands. On this basis, the Tribunal will assess the formal validity of the arbitration agreement according to Dutch law.

---

[46]  See, for example, H.J. Snijders, *GS Burgerlijke Rechtsvordering,* art. 1052 Rv, comment 2.1; G.J. Meijer, *Tekst en Commentaar Rechtsvordering*, art. 1052 of the DCCP, comment 3d.

[47]  E.g., Exhibit C-08, p. 9 (PO 1).

113. Pursuant to Article 10:166 of the DCC the applicable law governing the substantive validity of an arbitration agreement is the law that the parties have chosen, or the law of the seat of arbitration or, if the parties have not made a choice of law, the law that is applicable to the underlying legal relationship.[48]

114. The scope of substantive validity in the meaning of Article 10:166 of the DCC is intended to be broad. It extends to questions relating to the existence of the arbitration agreement, the formation of contract, possible issues of consent (*wilsgebreken*) and (other) defects that could lead to the agreement being null and void.

115. In the absence of any evidence of a choice of law with regard to the arbitration agreement, the Tribunal will assess these issues according to Dutch law, i.e., the law of the seat of the arbitration.

### C.    Clause 27 of the T&C qualifies as an arbitration agreement

116. An arbitration agreement is the agreement by which parties bind themselves to submit disputes between them, whether existing or those which may arise, and which arise from a specific legal relationship to arbitration (Article 1020(1) and (2) of the DCCP).[49] To qualify as an arbitration agreement, the agreement must include the following essential elements: (i) a clear choice for arbitration, (ii) an obligation (rather than a discretion) to submit disputes to arbitration, (iii) in respect of disputes, (iv) arising from a specified legal relationship.

117. The arbitration agreement reflected in Clause 27 of the T&C meets these requirements: (i) it refers expressly to arbitration under the Rules, (ii) it includes an obligation (disputes "<u>*shall be referred to*</u>" arbitration), (iii) it refers to "*disputes, controversies and claims*" and (iv) defines the underlying legal relationship, namely the Purchase Order.

118. Therefore, the Tribunal finds that Clause 27 of the T&C qualifies as an arbitration agreement under Dutch law.

### D.    Asia Genius and Bariven consented to arbitration

119. In Clause 1 of the T&C, "Parties" is defined as Buyer and Vendor, "Buyer" is defined as Bariven, and "Vendor" is defined as the entity to whom the Purchase Order is issued (i.e., Asia Genius). Bariven and Asia Genius therefore qualify as the parties to the arbitration agreement.

120. A contract – including an arbitration agreement – comes into existence through offer and acceptance (Article 6:217 of the DCC).[50] As the T&C were issued by PDVSA Services, on behalf of Bariven, the Tribunal will consider whether Bariven made a valid offer in

---

[48]   Article 10:166 of the DCC provides: "*Notwithstanding the provision of Article 154 an agreement to arbitrate shall be valid if that agreement is valid under the applicable law as agreed by the parties or under the laws of the seat of the arbitration or, if the parties have not agreed on the applicable law, under the laws applicable to the legal relationship to which the agreement to arbitrate applies.*"

[49]   Article 1020(1) and (2) of the DCCP provides:
"*(1) The parties may agree to submit to arbitration disputes which have arisen or may arise between them out of a defined legal relationship, whether contractual or not.*
*(2) The arbitration agreement referred to in paragraph (1) includes both the submission agreement by which the parties bind themselves to submit to arbitration an existing dispute between them and an arbitration clause under which parties bind themselves to submit to arbitration disputes which may arise between them.*"

[50]   Article 6:217(1) of the DCC provides: "*1. An agreement shall be formed by an offer and its acceptance.*"

connection with the arbitration agreement and whether this offer was subsequently accepted by Asia Genius.

<u>Offer by Bariven</u>

121. Clause 2 of the T&C provide that each PO constitutes an offer by PDVSA Services on behalf of Bariven to Asia Genius. As noted above, the T&C are an integral part of the POs and therefore form part of the offer made by PDVSA Services on behalf of Bariven.

122. The Tribunal finds that an offer was made by PDVSA Services in respect of the arbitration agreement but that it must also consider whether PDVSA Services validly made this offer on behalf of, and for the account of, Bariven.

123. Although the T&C are labeled as "PDVSA Services, BV Terms and Conditions", and were issued by PDVSA Services as part of the RfQs, PDVSA Services clearly communicated that it acted on behalf of Bariven. This follows from the following circumstances:

- The POs note that they are issued "*by PDVSA Services, BV on behalf of, and for the account of BARIVEN, S.A.*";
- The T&C (Clause 1) indicate that Bariven is "*represented for the purpose of the Order, by its agent, PDVSA Services B.V.*"
- 'Bariven S.A.' is noted as the primary party at the top of the RfQs and POs, with PDVSA Services labeled as the 'Purchasing Agent';
- The T&C (Clause 1) define Bariven as the 'Buyer' and the 'Party' to the PO.

124. Under Dutch law, the law applicable to questions of representation (*vertegenwoordigingsbevoegdheid*) should be determined by reference to the Convention on the Law applicable to Agency (Article 10:125(1) of the DCC).[51] In respect of the relationship between the principal (Bariven) and the third party (Asia Genius), Article 11 of the Convention on the Law applicable to Agency provides the law in which the agent has his business establishment applies. At the time of the contracts, PDVSA Services had its business address in the Netherlands and thus Dutch law regarding representation would apply.

125. In this arbitration, no written evidence of an agency agreement between Bariven and PDVSA Services has been provided; however, this is also not required since under Dutch law a power of attorney can be granted expressly or tacitly (Article 3:61(1) of the DCC).[52] The Tribunal finds that there is sufficient evidence on the record that Bariven acknowledged that it had been represented by PDVSA Services in respect of the POs and that PDVSA Services thus acted on the basis of a valid power of attorney. This follows from the following circumstances:

- There is direct email correspondence between personnel of Asia Genius and personnel of Bariven in relation to the payment of invoices, including emails in

---

[51] Article 10:125(1) of the DCC provides: "*1. The law applicable to agency shall be determined by the Convention on the Law Applicable to Agency concluded at The Hague on 14 March 1978 (Treaty Series 1978, 138).*
*2. The Convention shall not apply for agencies in respect of insurances.*"
[52] Article 3:61(1) of the DCC provides: "*1. Power of attorney can be granted expressly or tacitly.*"

which Bariven acknowledged that a certain sum was due in relation to the POs.[53]

- Bariven paid a portion of the invoices.[54]

126. The Tribunal also notes that it follows from a decision from a Dutch State Court referenced by Asia Genius[55], that it was apparently customary for Bariven to conduct its business through its agent, PDVSA Services. This decision relates to a dispute between TSHR and PDVSA Services, under similar circumstances as the arbitration at hand. Also in the case underlying the Dutch State Court's decision, PDVSA Services had issued a request for a quotation, a purchase order and applicable terms and conditions on behalf of Bariven. The District Court of The Hague dismissed TSHR's claim against PDVSA Services on the basis that the counterparty to the agreement was Bariven, and TSHR's claim thus had to be addressed to Bariven.[56]

127. On the basis of the above, the Tribunal finds that PDVSA Services was authorized to act on behalf of Bariven and that Bariven made an offer to Asia Genius in respect of the arbitration agreement.

Acceptance by Asia Genius

128. The T&C provide that the PO will become a binding contract upon the Vendor either (i) providing written acceptance of the Purchase Order or (ii) delivering all or any portion of the ordered materials (Clause 2). As noted above, the T&C are an integral part of the POs.

129. In respect of PO 1, Asia Genius has provided its written acknowledgment of PO 1.[57] The acknowledgement issued by Asia Genius of PO 1 states: "*We confirm receipt of your above-mentioned facsimile Purchase Order and / or facsimile Change Order and herewith acknowledge acceptance of this order including all terms and conditions*". The Tribunal finds that Asia Genius accepted the T&C and is bound by the arbitration agreement in respect of PO 1.

130. Asia Genius has not provided its written acknowledgment in respect of PO 2-9, but states that it issued such acknowledgment as part of the standard procedure.[58] In addition, PO 4, PO 5, PO 6, PO 8 and PO 9 explicitly state that in the absence of a written acknowledgement within 48 hours, the PO is deemed to be accepted. Further, Asia Genius states that it delivered conforming goods for all of the POs, and certain (advance) payments have been made by Bariven for various POs.[59] Based on the evidence on the record, the Tribunal is sufficiently convinced that Asia Genius agreed to POs 2-9, accepted the T&C, and is bound by the arbitration agreement included therein.

Conclusion

131. In summary, the Tribunal finds that there has been an offer (by PDVSA Services, on behalf of Bariven) and an acceptance of that offer (by Asia Genius) of the arbitration

---

[53]  Exhibit C-28, C-29, C-32, C-33, C-65.
[54]  SoC, para. 10.
[55]  SoC, at para. 19 and footnote 39.
[56]  District Court The Hague 24 May 2017, ECLI:NL:RBDHA:2017:5802.
[57]  Exhibit C-12.
[58]  SoC, para. 7(vii).
[59]  SoC, para. 32. Advance payments were made in respect of PO 1, PO 2, PO 3 and PO 4. Other partial payments were made in respect of PO 5 and PO 6.

agreement and that Bariven and Asia Genius thereby entered into an arbitration agreement.

132. The Tribunal finds that there are no indications present that there were other issues that should raise concerns of consent (e.g., error, fraud, deceit, or undue influence).

### E. The arbitration agreement is formally valid

133. Article 1021 of the DCCP provides that an arbitration agreement shall be proven by an instrument in writing.[60] Article 1021 of the DCCP adds that an 'instrument in writing' includes arbitration clauses contained in standard terms and conditions, provided that the terms and conditions are expressly or impliedly accepted by the other party.

134. As discussed in the preceding Section, Asia Genius accepted the T&C. Therefore, the Tribunal finds that Clause 27 of the T&C meets the requirements of formal validity.

### F. Venezuelan law does not prevent the Tribunal from having jurisdiction

135. As follows from Dutch case law (as discussed below), under domestic Venezuelan law an arbitration agreement with a Venezuelan state-owned company is only valid if written authorization to enter into the agreement was obtained from the applicable government Minister. This follows from Article 4 of the Venezuelan Commercial Arbitration Act ("**VCAA**"), which provides:

> "Should one of the parties of an arbitration agreement be a corporation in which the Republic, the States, the Municipalities and the Autonomous Agencies hold a participation equal to or higher than fifty percent (50%) of its equity or a corporation in which the aforesaid persons hold a participation equal to or higher than fifty percent (50%) of its equity, the agreement requires approval from the appropriate corporate entity and the written authorization from the directive Minister to be valid. The arbitration agreement shall specify the type of arbitration and the number of Arbitrators, in no case to be lower than three (3)."

136. This may be relevant because under Dutch law (Article 10:118, 10:119 of the DCC), the question of a party's capacity to enter into a contract should be determined according to the domestic law applicable to that party (i.e., Venezuelan law for Bariven).[61] The

---

[60] Article 1021 of the DCCP provides: "*The arbitration agreement shall be proven by an instrument in writing. For this purpose an instrument in writing which provides for arbitration or which refers to standard conditions providing for arbitration is sufficient, provided that this instrument is expressly or impliedly accepted by or on behalf of the other party. The arbitration agreement may also be proven by electronic data. Article 227a(1) of Book 6 of the Civil Code shall apply mutatis mutandis.*"

[61] Article 10:118 of the DCC provides: "*A corporation which, under its agreement or deed of establishment, has its corporate seat or registered office, or, in the absence thereof, its external centre of activities on the date of establishment in the territory of the State under the laws of which it is established, shall be governed by the law of that State.*"
Article 10:119 of the DCC provides: "*The law governing a corporation shall extend, in addition to its establishment, in particular to the following subject matters: a. the possession of legal personality or the power to be the subject of rights and obligations, to perform legal acts and to act at law; b. the internal regulation of the corporation and all subject matters related thereto; c. the representative authority of constituent bodies and officers of the corporation; d. the liability of directors, supervisory board members and other officers in that capacity as regards the corporation; e. the question who, jointly with the corporation, is liable for any acts by which the corporation is bound pursuant to an authority such as that of an incorporator, partner, shareholder, member, director, supervisory board member or other officer of the corporation; f. the termination of the existence of the corporation.*"

aforementioned Article 4 VCAA applies to Bariven because it is a wholly owned Venezuelan subsidiary of Petróleos de Venezuela S.A., the Venezuelan state-owned oil and natural gas company.[62]

137. In two decisions rendered by the District Court of The Hague in the Netherlands – also relating to disputes involving Bariven – the District Court took Article 4 VCAA into account in its assessment of the validity of an arbitration agreement between Bariven and another party.[63]

138. In this arbitration, however, neither Asia Genius nor Bariven have made any submissions or provided evidence in respect of (the application of) Article 4 VCAA and whether Bariven obtained ministerial authorization to enter into the arbitration agreement. The Tribunal, therefore, cannot ascertain definitively whether Bariven had the capacity to enter into the arbitration agreement.

139. At the same time, the Tribunal notes that in the present arbitration Asia Genius does not contest Bariven's capacity to enter into the arbitration agreement. In that sense, the arbitration at hand clearly differs from the aforementioned two decisions from the District Court of The Hague, as in those cases, it was Bariven's counterparties who contested the validity of the arbitration agreement and invoked Article 4 VCAA.

140. In this case, Asia Genius does not contest the validity of the arbitration agreement and neither did Bariven, who has not appeared in this arbitration. None of the Parties thus has invoked Article 4 VCAA. Important to the Tribunal, as part of its assessment of its jurisdiction, is also that under Dutch law (Article 10:167 of the DCC), a state enterprise also may not invoke its own laws to contest its capacity to enter into an arbitration agreement if its counterparty did not know or could not have been expected to know of the relevant law.[64]

141. Article 10:167 of the DCC is the codification of the DIO/IMS decision of the Supreme Court of the Netherlands.[65] The Supreme Court in the DIO/IMS considered:

> "With respect to DIO's reliance on Article 139 of the Constitution, the Court of Appeal assumes that, as DIO argues, this provision implies what DIO has argued in this regard, that its effect under the law of Iran is that an arbitration agreement concluded without the approval of the Iranian Parliament is invalid. However, DIO is not entitled to invoke that nullity. It is a now widely accepted international principle that a State or an organization belonging to a State, such as DIO is, as has been established between the parties, is not entitled to rely on its own internal law to argue that an agreement for international arbitration is invalid.

---

[62]   RfA, para. 4. SoC, para. 6.
[63]   Rechtbank Den Haag 18 August 2020 (District Court the Hague), ECLI:NL:RBDHA:2020:8030; Rechtbank Den Haag 18 May 2022 (District Court The Hague), ECLI:NL:RBDHA:2022:5314. In each of these two cases, the counterparty had brought a claim against Bariven in front of the District Court and Bariven had contested the court's jurisdiction on the basis that the parties had entered into an arbitration agreement. In both cases, the District Court determined that no valid arbitration agreement existed between the parties because Bariven had been unable to demonstrate that it had obtained the ministerial authorization required by Article 4 VCAA.
[64]   Article 10:167 of the DCC provides: "*If a State, another legal person governed by public law or a state-owned company is a party to an agreement to arbitrate, it may not invoke its laws or regulations to dispute its capacity or powers to enter into the agreement to arbitrate or to argue that the dispute may be decided by arbitration, if the other party did not know such law or regulation and should not be considered to have been required to know such law or regulation.*"
[65]   Hoge Raad 28 January 2005, ECLI:NL:HR:2005:3645, para. 3.6.2.

> This rule also applies in the situation where the internal law impediment was already in force before the arbitration agreement was concluded. Different than DIO assumes, the rationale of this rule is indeed not primarily to prevent a State from affecting an arbitration agreement once concluded by means of subsequently introduced legislation, although that would undoubtedly also be unacceptable. Rather, the rationale is that it is contrary to good faith for a State to invoke its own regulations to evade an arbitration agreement it has entered into."
>
> (Para 3.3 Supreme Court's decision, quoting from para 4.2 of the preceding decision of the Court of Appeal, The Hague, the Netherlands, courtesy translation provided, and emphasis added, by the Tribunal)

142. Bariven is a wholly owned subsidiary of Petróleos de Venezuela S.A., which is a state-owned company, and can thus be considered a state enterprise in the meaning of Article 10:167 of the DCC.[66] Bariven, therefore, could only invoke Venezuelan law to argue that it lacked capacity to enter into an arbitration agreement if Asia Genius knew or could be expected to have known about the Venezuelan law. On the basis of the submissions and the documents on the record, the Tribunal finds that there are no indications that Asia Genius knew or could be expected to have known about Article 4 VCAA. In this respect the Tribunal also notes that the two aforementioned judgments from the District Court of The Hague were only published in 2020 and 2022, which was long after the date on which the nine POs were issued by PDVSA Services on behalf of Bariven and agreed to by Asia Genius.

143. The Tribunal, therefore, finds that Article 4 VCAA does not prevent the Tribunal from finding that it has jurisdiction in this arbitration.

### G.   The subject matter of the dispute is arbitrable

144. Next, with regard to the arbitrability of the dispute, Dutch law provides that the arbitration agreement shall not serve to determine legal consequences that may not be freely determined by the parties (Article 1020(3) of the DCCP).[67]

145. The arbitration agreement between Bariven and Asia Genius refers to "*disputes, controversies and claims arising out of, involving, or relating to the Order*". The POs clearly represent a commercial agreement and the dispute in this arbitration relates to commercial questions regarding the payment of invoices. This falls within the scope of the arbitration agreement and therefore such issues are arbitrable according to Dutch law.

### H.   The Tribunal was validly constituted

146. Finally, it is also clear that the Tribunal was constituted in accordance with the arbitration agreement and the Rules. The arbitration agreement provides that the arbitral tribunal should consist of three arbitrators. Each Party has the right to appoint one arbitrator, with the third arbitrator being appointed by the two party-appointed arbitrators, all in accordance with the Rules:

> "Any and all disputes, controversies and claims arising out of, involving, or relating to the Order shall be referred to, settled, and finally resolved

---

[66]   Koppenol-Laforce & N. Gonzales, Tekst en Commentaar Burgerlijk Wetboek, Art. 10:167, comment 2.

[67]   Article 1020(3) of the DCCP provides: "*The arbitration agreement shall not serve to determine legal consequences that may not be freely determined by the parties.*"

exclusively by arbitration under the rules of the ICC International Court of Arbitration (the "Rules") <u>by three arbitrators appointed in accordance with the Rules</u>. All procedural matters arising in connection with any arbitration shall be resolved in accordance with the Rules. <u>The Party commencing the arbitration shall appoint one arbitrator and the defendant Party shall appoint one arbitrator and a third arbitrator will be appointed by the two arbitrators appointed by the Parties, in accordance with the Rules</u>." (Underlining added)

147.   In this arbitration, Ms. Nathalie Voser was nominated as arbitrator by Claimant. As Respondent has not appeared in the arbitration, the Court subsequently appointed Mr. Paul Arrighi as co-arbitrator on behalf of Respondent; this is in accordance with the Rules (Article 12(4) Rules). The two co-arbitrators jointly nominated Ms. Bregje Korthals Altes to be the President of the Tribunal.

148.   The Tribunal therefore finds that it was validly constituted in accordance with the arbitration agreement and the Rules.

**I.   Conclusion**

149.   The Tribunal concludes that a valid arbitration agreement exists between Asia Genius and Bariven and that it has jurisdiction to decide on the requests for relief made by Asia Genius in this arbitration.

**10.   THE TRIBUNAL'S REASONING ON THE LIABILITY AND THE QUANTUM OF CLAIMANT'S CLAIM**

150.   Although this arbitration has a long history, and has certainly not been without complications, the underlying dispute between Asia Genius and Bariven is straightforward: it concerns a dispute over unpaid invoices. Asia Genius claims that Bariven breached its contractual obligations towards Asia Genius by failing to pay several invoices for goods that Asia Genius had delivered to Bariven under PO 1 – PO 9, for a total outstanding principal amount (excluding interest) of USD 49,670,681.14. Apart from a declaration that Bariven breached its contractual payment obligation vis-à-vis Asia Genius, Asia Genius seeks payment of the outstanding amount, plus statutory commercial interest in accordance with Article 6:119a of the DCC from 30 days of the receipt of each unpaid invoice until effective payment.[68]

151.   According to Article 1043a(2) of the DCCP, if the respondent, although having been given the reasonable opportunity, fails to submit its defence without providing justified reasons for its failure to do so, the arbitral tribunal, may immediately make an award.[69] Before making its award, the arbitral tribunal may also order the claimant to furnish

---

[68]   Article 6:119a(1) of the DCC provides: "*1. The damages due on account of a delay in payment of a sum of money shall, in the case of a commercial agreement, consist of statutory interest over such sum as from the date following the date agreed upon as final payment date until and including the date of the actual payment of that sum by the debtor. A 'commercial agreement' means an agreement for value pursuant to which one or more parties must give or do something and which is made by and between one or more natural persons acting in the conduct of a profession or business, or by and between legal persons.*"

[69]   Article 1043a(2) of the DCCP provides: "*If the respondent, although reasonably given the opportunity to do so, fails to submit its defence, without asserting well-founded reasons, the arbitral tribunal may immediately make an award.*"

(further) evidence of one or more of its assertions (1043a(3) of the DCCP).[70] It further follows from Article 1043a(3) of the DCCP, that if the conditions of Article 1043a(2) of the DCCP have been met, the claim will be awarded (in Dutch: "*de eis wordt toegewezen*"), unless the arbitral tribunal finds that the claim is unlawful or unfounded (in Dutch: "*onrechtmatig of ongegrond*").

152.   Bariven has been invited multiple times to participate in the arbitration, and the Tribunal finds that there can be no doubt whatsoever that Bariven is aware of the arbitration as well as of Asia Genius' claims. As also follows from paragraphs 19, 26 and 67 above Claimant has made a sufficient showing that Bariven received the RfAs, as well as the Statement of Claim, including all accompanying exhibits. Further, Respondent was given every opportunity to submit a statement of defence. Bariven, however, has chosen not to appear and not to put forward any defences against Asia Genius' claims.

153.   Since no defence was raised in the arbitration, the Tribunal must rule on the basis of the contentions contained in the RfAs and the Statement of Claim, and the exhibits attached thereto. In addition, as pointed out in paragraph 74 above, the Tribunal requested Claimant on 8 December 2022 to provide certain clarifications regarding the Statement of Claim and to submit some translations and additional exhibits on the basis of Article 25(4) of the Rules and Section 5.1 of Procedural Order No. 1. These were provided by Claimant on 16 December 2022, after which a cost-submission was made on 23 January 2023. The proceedings were closed on 17 February 2023.

154.   In the Tribunal's view, Asia Genius has sufficiently established the factual and legal (contractual and statutory) basis of its claim, and has furnished adequate evidence of the POs, as well as the invoices for the various POs.

155.   Pursuant to Clause 4 of the T&C, Bariven had 30 days from PDVSA Services' receipt of a correct and conforming invoice to effect payment but failed to comply with its payment obligations. The Tribunal agrees with Asia Genius that, according to Article 6:83 of the DCC, Bariven was in default of its payment obligation from that date (i.e., 30 days following receipt of the invoice) onward.[71]

156.   Since its obligation was subject to a time stipulation, there was no need for Asia Genius to send a letter of formal notice pursuant to Article 6:82 of the DCC.[72] Nevertheless, such formal notice was sent to Bariven and put on record by Asia Genius as Exhibit C-30.

157.   There is nothing on the record that suggests that one of the scenarios occurred that would have allowed Bariven to withhold payment under Clause 4(III) of the T&C. Rather,

---

[70]   Article 1043a(3) of the DCCP provides: "*In the award referred to in the second paragraph, the claim shall be awarded, unless it appears to the arbitral tribunal to be unlawful or unfounded. The arbitral tribunal may, before making its award, require proof from the claimant of one or more of its assertions.*"

[71]   Article 6:83 of the DCC provides: "*Default shall commence without notice of default being required: a. where a term set for satisfaction expires without the obligation having been performed, unless it appears that the term has another purpose; b. where the obligation arises from a tort or relates to the compensation of loss referred to in Article 74(1) and the obligation is not immediately performed; c. where a creditor must conclude from a communication from the debtor that the latter will fail in the performance of the obligation.*"

[72]   Article 6:82 of the DCC provides: "*1. Default shall commence when the debtor is given written notice of default granting him a reasonable period for the performance and there is no performance within such period. 2. If a debtor is temporarily unable to perform or if it is evident from his attitude that a warning would serve no purpose, he may be put into default by a written notice to the effect that he is held liable for his non-performance.*"

Asia Genius has adduced evidence that Bariven acknowledged its debt towards Asia Genius by email of 12 February 2015. In the email from Ana Diaz of Bariven, it is noted:[73]

> "Regarding the debt, we have registered in our system an outstanding amount of US\$ 49.675.479,64 – already deducting US\$ 800.000. However, we have a small difference with US\$ 50.475.479.
>
> I will send you the full statement of account for your review by separate email."

158. On the same day, 12 February 2015 (14:26), Ana Diaz of Bariven sent Asia Genius an email stating "[p]*lease find attached the statement of account*.[74] The email included an attachment titled "Vendor Line Item Display.HTM".[75] The attachment is a spreadsheet, which lists all Asia Genius' invoices, and indicates in Spanish that they have been "*Aprobada*", which means "approved".

159. Again in 2017, that is almost five years after the first POs were issued, it was confirmed that there were "no discrepancies" between Asia Genius' claims and the information in the Bariven/PDVSA Services system.[76]

160. The Tribunal has noted that there is a small discrepancy of USD 4,798.50 between the total debt that was acknowledged by Bariven and included in the statement of accounts in Exhibit C-28, which amounts to USD 49,675,479.64 and the total principal sum in outstanding invoices (minus payments made, and credit held, by Bariven) which Asia Genius now claims in the SoC, which amounts to USD 49,670,681.14.

161. The reason for this discrepancy, as explained by Asia Genius, is that the amounts for two invoices, namely AG-10042 and AG-10043 in respect of PO 4, were stated erroneously in the RfA. The proper amount is stated in the actual invoices (Exhibit C-52 and Exhibit C-53). The mistake has been corrected in the SoC, resulting in a slightly lower claim.

162. Based on the above, Asia Genius' claims for payment of the outstanding principal sum, after applying the credit for Bariven's overpayment, will be awarded as stated in the operative part of this Final Award.

163. The pre- and post-award statutory commercial interest (capitalized annually), as claimed by Asia Genius, will also be awarded. The Tribunal finds that the POs constitute commercial agreements within the meaning of Article 6:119a of the DCC. Under Dutch law, the failure to pay invoices by the due date for such payment is sufficient for statutory commercial interest to be due and there is nothing on the record that indicates that a claim for statutory commercial interest as such is otherwise "unlawful or unfounded". Nevertheless, in the Tribunal's view a correction must be made when it comes to the calculation of the statutory commercial interest.

164. The Tribunal agrees with Asia Genius that the statutory interest is to be calculated over the amount due under each unpaid invoice, which amount is indicated in the second column of the table under paragraph 36 of the SoC. As claimed by Asia Genius, the amount due in respect of Invoice AG-100065 (PO 8) takes into account the deduction of

---

[73]    Exhibit C-32 (resubmitted with English translation).
[74]    Exhibit C-29 (resubmitted with English translation); Exhibit C-65.
[75]    Exhibit C-28.
[76]    Exhibit C-66.

the credit of USD 800,000 owed by Asia Genius to Bariven, which deduction takes place prior to the calculation of interest.

165. The Tribunal also agrees with Asia Genius that statutory commercial interest will have to be calculated as from one day after the expiry date for payment of the relevant invoices until the day of effective payment and compounded on a yearly basis. However, the Tribunal is not persuaded and not willing to accept the breakdown as presented by Claimant in paragraph 36, table 3, of the SoC. While the due date as stipulated in the breakdown in that table 3 seems to build on the date of issuance of the respective invoice as mentioned in paragraph 36 of the RfA, the actual invoices as submitted by Claimant in some cases show a later date (including for two invoices, a date that is a year later), and in one case an earlier date (see also paragraph 92 above). Those later dates and the one earlier date are also fully consistent with the dates recorded by Claimant in the overview of unpaid invoices in the Index of Exhibits with the RfA. The Tribunal will therefore disregard dates that are earlier than those evidenced on the actual invoices, as put on the record by Claimant.

166. The Arbitral Tribunal has verified the purchase orders and invoices as well as the due dates. The table below sets out the amount due under each invoice, the date of the invoice, the due date noted by Claimant in paragraph 36 of the SoC and the corrected due date (if any) for the purposes of calculating statutory interest. The discrepancies between the dates noted by Claimant and the dates derived from the actual invoices as submitted by Claimant are marked in red.

| Invoice No. | Amount due | Date of invoice (as stated on actual invoice as put on the record) | Due Date according to Claimant | Correct expiry date: date on actual invoice +30 (red) | Start date calculation interest |
|---|---|---|---|---|---|
| Purchase Order 1 | | | | | |
| AG-100031 | USD 2,373,000 | 3 January 2013 | 2 February 2013 | **2 February 2013** | 3 February 2013 |
| Purchase Order 2 | | | | | |
| AG-100011 | USD 3,020,346 | 18 October 2012 | 17 November 2012 | **17 November 2012** | 18 November 2012 |
| AG-100018 | USD 1,632,120 | 26 November 2012 | 26 December 2012 | **26 December 2012** | 27 December 2012 |
| AG-100025 | USD 1,834,728 | 18 December 2012 | 17 January 2013 | **17 January 2013** | 18 January 2013 |
| AG-100041 | USD 1,601,166 | 4 March 2013 | 28 February 2013 | **3 April 2013**[77] | 4 April 2013 |
| Purchase Order 3 | | | | | |
| AG-100032 | USD 1,272,600 | 3 January 2013 | 2 February 2013 | **2 February 2013** | 3 February 2013 |
| Purchase Order 4 | | | | | |
| AG-100020 | USD 553,896 | 29 November 2012 | 29 December 2012 | **29 December 2012** | 30 December 2012 |
| AG-100021 | USD 415,422 | 6 December 2012 | 11 January 2013 | **11 January 2013**[78] | 12 January 2013 |
| AG-100022 | USD 725,088 | 12 December 2012 | 11 January 2013 | **11 January 2013** | 12 January 2013 |
| AG-100026 | USD 789,301.80 | 18 December 2012 | 17 January 2013 | **17 January 2013** | 18 January 2013 |
| AG-100027 | USD 725,088 | 18 December 2012 | 17 January 2013 | **17 January 2013** | 18 January 2013 |
| AG-100029 | USD 725,088 | 3 January 2013 | 2 February 2013 | **2 February 2013** | 3 February 2013 |
| AG-100030 | USD 435,052.80 | 3 January 2013 | 2 February 2013 | **2 February 2013** | 3 February 2013 |

---

[77] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 4 March 2013 (Exhibit C-39), resulting in an actual due date of 3 April 2013.

[78] This date is accepted, although the due date seems to be earlier, given that the invoice submitted as Exhibit C-42 is dated 6 December 2012.

| Invoice No. | Amount due | Date of invoice (as stated on actual invoice as put on the record) | Due Date according to Claimant | Correct expiry date: date on actual invoice +30 (red) | Start date calculation interest |
|---|---|---|---|---|---|
| AG-100033 | USD 435,052.80 | 4 January 2013 | 3 February 2013 | **3 February 2013** | 4 February 2013 |
| AG-100036 | USD 870,105.60 | 15 January 2013 | 14 February 2013 | **14 February 2013** | 15 February 2013 |
| AG-100038 | USD 580,070.40 | 29 January 2013 | 28 February 2013 | **28 February 2013** | 1 March 2013 |
| AG-100039 | USD 1,305,158.40 | 6 February 2013 | 28 February 2013 | **8 March 2013**[79] | 9 March 2013 |
| AG-100042 | USD 579,977.22 | 11 March 2013 | 10 April 2013 | **10 April 2013** | 11 April 2013 |
| AG-100043 | USD 580,070.40 | 1 April 2013 | 1 May 2013 | **1 May 2013** | 2 May 2013 |
| AG-100044 | USD 580,070.40 | 1 April 2013 | 1 May 2013 | **1 May 2013** | 2 May 2013 |
| AG-100046 | USD 580,070.40 | 22 April 2013 | 22 May 2013 | **22 May 2013** | 23 May 2013 |
| AG-100049 | USD 623,575.68 | 26 April 2013 | 25 May 2013 | **26 May 2013**[80] | 27 May 2013 |
| **Purchase Order 5** | | | | | |
| AG-100050 | USD 819,316.86 | 2 May 2013 | 1 June 2013 | **1 June 2013** | 2 June 2013 |
| **Purchase Order 6** | | | | | |
| AG-100051 | USD 3,475,599.30 | 3 May 2013 | 1 June 2013 | **2 June 2013**[81] | 3 June 2013 |
| AG-100053 | USD 2,393,220.53 | 12 June 2013 | 12 July 2013 | **12 July 2013** | 13 July 2013 |
| AG-100055 | USD 6,484,524.45 | 19 June 2013 | 19 July 2013 | **19 July 2013** | 20 July 2013 |
| AG-100060 | USD 24,061.68 | 25 July 2013 | 19 July 2013 | **24 August 2013**[82] | 25 August 2013 |
| **Purchase Order 7** | | | | | |
| AG-100048 | USD 5,822,952.42 | 26 April 2013 | 25 May 2013 | **26 May 2013**[83] | 27 May 2013 |
| **Purchase Order 8** | | | | | |
| AG-100065 | USD 8,166,400 | 6 December 2013 | 5 January 2013 | **5 January 2014**[84] | 6 January 2014 |
| **Purchase Order 9** | | | | | |
| AG-100064 | USD 247,558 | 4 December 2013 | 5 January 2013 | **3 January 2014**[85] | 4 January 2014 |

167. The statutory commercial interest (capitalized annually), as published by the Dutch Central Bank and updated every six months, is awarded for the amount due under each invoice from one day after the expiry date for payment of the relevant invoice, until the date of full and final payment.[86] The calculation of the pre-award interest as claimed by Asia Genius (see paragraph 107(b) above) is based on and Excel-spreadsheet created by Asia Genius, submitted as Exhibit C-67. The calculation has been made by Asia Genius until 23 January 2023, the date of its cost submission. For the calculation of the pre-award interest up to and including the date of the Final Award, the Tribunal has not

---

[79] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 6 February 2013 (Exhibit C-51), resulting in an actual due date of 8 March 2013.

[80] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 26 April 2013 (Exhibit C-56), resulting in an actual due date of 26 May 2013.

[81] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 3 May 2013 (Exhibit C-58), resulting in an actual due date of 2 June 2013.

[82] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 25 July 2013 (Exhibit C-61), resulting in an actual due date of 24 August 2013.

[83] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 26 April 2013 (Exhibit C-62), resulting in an actual due date of 26 May 2013.

[84] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 6 December 2013 (Exhibit C-63), resulting in an actual due date of 5 January 2014.

[85] This deviates from the due date put forward by Claimant. The date of issuance of the PO is 4 December 2013 (Exhibit C-64), resulting in an actual due date of 3 January 2014.

[86] By way of example: if in the right most column the expiry date is confirmed as 2 February 2013, the start date for calculating statutory commercial interest is 3 February 2013.

relied on this spreadsheet,[87] but on the publicly available tools for the calculation of statutory commercial interest from independent third parties.[88] Taking all the above into account, the Tribunal finds that the pre-award statutory commercial interest up to and including the date of this Final Award amounts to USD 56,780,663.80.

168. Further, Asia Genius has stated that the five-year prescription period of Article 3:307 of the DCC was interrupted at various moments in time.[89] Under Dutch law, a tribunal can only decide on issues of prescription if invoked by the respondent (Article 3:322(1) of the DCC).[90] As Bariven did not appear in this case, the question of prescription - and the circumstances adduced, and evidence submitted by Asia Genius[91] in this respect - need not to be discussed and decided by the Tribunal.

169. For the rest, the Tribunal does not consider it necessary to address separately and explicitly each one of the arguments as raised by Claimant for the purpose of this award. In the Tribunal's view, Asia Genius has sufficiently established the factual and legal (contractual and statutory) basis of its claim including the interests due, and has furnished adequate evidence of the POs, as well as the invoices for the various POs. There is nothing on the record that indicates that Asia Genius' claims are otherwise "unlawful" or "unfounded", and no indications of corruption or other public policy considerations that would prevent the granting of the relief requested by Claimant.

## 11.  DECISION ON COSTS

170. As its final task, the Tribunal will proceed to rule on the legal and arbitration costs.

171. The arbitration clause (Clause 27 of the T&C) provides that "[t]*he payment of the costs and expenses of the arbitration will be determined by the arbitrators*".

172. Article 38(1) of the Rules provides that the costs of the arbitration shall be understood to mean the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scales in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration

173. Article 38(4) and (5) of the Rules provide that the Tribunal shall determine the costs of the arbitration, and that the Tribunal has wide discretion in deciding which party should bear the costs of the arbitration. In exercising its discretion to award the costs of the arbitration, the Tribunal must review the outcome of the proceedings in light of the context of the particular dispute and the conduct of the arbitration.

---

[87]   This is partly because Claimant's spreadsheet mistakenly seems to anticipate changes in the interest rate by a day. For example, if a new interest rate applies as of 1 July of a given year, it seems that Claimant has applied the new rate already as of 30 June of that same year.
[88]   The Tribunal has relied on the interest calculation tool available at www.wettelijke-rente.com.
[89]   RfA, para. 32-35, and para. 27-31 SoC, and Exhibit C-30.
[90]   Article 3:322(1) of the DCC provides: "*1. The court may not, ex officio, apply the defence resulting from prescription.*"
[91]   In particular Exhibit C-30.

### A.    Claimant's costs

174. At the Tribunal's invitation, on 23 January 2023, Claimant made a submission as to whether and how the Tribunal should award the costs of the arbitration. By letter of 31 January 2023, Claimant provided further exhibits, and corrected certain amounts, regarding its submission on costs.

175. Claimant claims that it should be entitled to recover its full costs of the arbitration and seeks a full reimbursement of the costs set out in its Cost Submission. Claimant's costs include (i) fees and expenses related to legal representation and (ii) fees and expenses of the Tribunal and the ICC's administrative fees.[92]

176. In respect of legal representation, Claimant indicates that it has incurred the following costs:[93]

    (i) Fees of Dechamps International Law: USD 1,261,000 and EUR 60,000;

    (ii) Expenses and disbursements: USD 24,739.92.

177. The fees for Dechamps International Law reflect the amount of a fixed fee arrangement between Dechamps International Law and Claimant for the purposes of this arbitration. Included within the fixed fee arrangement are the fees of SSHJ Advocaten and Jonathan J. Gass, which were paid by Dechamps International Law directly to SSHJ Advocaten and Jonathan J. Gass, respectively.[94]

178. This results in the following breakdown:[95]

    (i) Fees of SSHJ Advocaten: USD 21,787.47;

    (ii) Fees of Jonathan J. Gass: USD 402.19;

    (iii) Remainder of the fixed fee arrangement for work performed by Dechamps International Law: USD 1,238,810.34 and EUR 60,000.

179. In respect of the fees and expenses related to the Tribunal and the ICC, Claimant has paid the advance on costs fixed by the ICC at EUR 570,000. The Court has in its session of 8 March 2023 fixed the costs of the arbitration at the amount of EUR 440,000.  This amount includes EUR 354,069 in relation to the Tribunal's fees and expenses and EUR 85,931 in relation to the ICC's administrative expenses.

180. In addition, Claimant claims interest on the total amount of costs incurred, at the applicable statutory interest rates on the basis of Article 6:119 of the DCC, with the start date being the date of the Tribunal's Final Award.[96]

---

[92] Claimant's Cost Submission, para. 11-12.
[93] Claimant's Cost Submission, para. 15, as amended by Claimant's letter of 31 January 2023.
[94] Claimant's letter of 31 January 2023.
[95] Claimant's Cost Submission, para. 15(a).
[96] Article 6:119 of the DCC provides: "*1. Damages due on account of delay in the payment of a sum of money shall consist of statutory interest on that sum over the period in which the debtor has been in default of payment.*
*2. At the end of every year, the amount on which statutory interest is calculated shall be increased by the interest due over that year.*
*3. If the agreed interest exceeds that due pursuant to the preceding paragraphs, it shall accrue instead of statutory interest, as from the debtor's default.*"

**B.    The Tribunal's assessment and decision on costs**

181.  As Claimant has been almost entirely successful in its claims, the Tribunal finds that Claimant is entitled to reasonable compensation for these costs.

182.  The Tribunal finds Respondent must reimburse Claimant in full for the fees and expenses of the Tribunal and the ICC. In addition, the Tribunal considers the costs in connection with the fees of SSHJ and Jonathan J. Gass (set out in paragraph 178(i) and (ii), as well as the expenses and disbursements incurred by Claimant (set out in paragraph 176176(ii)) to be reasonable, and that Claimant is entitled to full recovery for these costs.

183.  In respect of the fees of Dechamps International Law (set out in paragraph 176(i) above, the Tribunal considers the following.

184.  The Tribunal understands that the fees of Dechamps International Law reflect the amount of a fixed fee arrangement entered into by Dechamps International Law with Claimant for the work in these proceedings.[97] On the basis of the documentation provided by Claimant, the Tribunal further understands that Dechamps International Law has spent 975 hours in connection with its work in this arbitration. In the Tribunal's view, although it can and does not interfere with this fixed fee arrangement between Claimant and its legal counsel, this does not necessarily mean - even in case of a successful claim – that this fixed fee is passed on 1-on-1 in the relationship between Claimant and Respondent.  Rather, notwithstanding a fixed fee arrangement, when it comes to the relationship between the parties to the arbitration, the arbitral tribunal applies the "reasonableness"-test as provided for in Article. 38(1) of the Rules.

185.  When applying the fixed fees received against the actual time spent, the average hourly fee of Dechamps International Law amounts to about USD 1'270. Indeed, due to Respondent non-participation in the arbitration, the Statement of Claim in essence repeated the allegation on the Request for Arbitration and the submissions made in the arbitration were rather limited. The Tribunal, therefore, does not consider the amount of the fixed fee as being reasonable and, applying the discretion granted to it under Article 38(1) of the Rules, reduces the amount of the costs that are awarded to Claimant for the fees of Dechamps International Law and shall order that Respondent shall pay 60% of these costs. This amounts to USD 743,286.20 and EUR 36,000.

186.  In summary, the Tribunal shall order Respondent to pay the following costs of the arbitration incurred by Claimant.:

  (i)   Dechamps International Law: USD 743,286.20 and EUR 36,000;

  (ii)  SSHJ Advocaten: USD 21,787.47;

  (iii) Jonathan J. Gass: USD 402.19;

  (iv) Expenses and disbursements: USD 24,739.92;

 Total costs related to legal representation: USD 790,215.78 and EUR 36,000.

  (v)  Fees and expenses of the Tribunal: 354,069.00;

---

[97]     Claimant's Cost Submission, footnote 9.

(vi) Administrative fees of the ICC: EUR 85,931;

Total costs of the Tribunal and the ICC amount to EUR 440,000.

187.  In the event payment of the amounts indicated in the previous paragraph is not made within seven days after the Final Award, Respondent is also to pay statutory interest (capitalized annually) pursuant to Article 6:119 of the DCC over USD 790,215.79 and EUR 476,000 as from one day after the expiry date for payment until the date of full and final payment. The seven-day-term should allow Respondent a reasonable period to make the payment.

## 12.  DECISION

188.  For the reasons set out above, deciding in accordance with the rules of law, the Tribunal hereby:

(i)    DECLARES that it has jurisdiction to decide the disputes submitted to it;

(ii)   DECLARES that Bariven breached its contractual obligations towards Asia Genius under Dutch law by failing to comply with its payment obligations under the Purchase Orders;

(iii)  ORDERS Bariven to pay Asia Genius the total outstanding principal amount of USD 49,670,681.14;

(iv)   ORDERS Bariven to pay Asia Genius pre-award statutory commercial interest (capitalized annually) as provided in Article 6:119a of the DCC, on the principal amount as set out under (iii) above amounting to USD 56,780,663.80 at the date of this Final Award;

(v)    ORDERS Bariven to pay Asia Genius post-award statutory commercial interest (capitalized annually) as provided in Article 6:119a of the DCC, on the amounts under (iii) and (iv) above, starting from one calendar day following the date of the Tribunal's Final Award, until the date of full and final payment.

(vi)   ORDERS Bariven to pay the costs and fees of the Arbitration in the amount of USD 790,215.78 and EUR 36,000 arising out of the Claimant's costs for legal representation;

(vii)  ORDERS Bariven to pay the costs and fees of the Arbitration in respect of the fees and expenses of the ICC and the Tribunal in the amount of EUR 440,000;

(viii) ORDERS Bariven to pay the statutory interests (capitalized annually) in accordance with Article 6:119 of the DCC on the amounts stated under (vi) and (vii) above starting from seven calendar days following the date of the Tribunal's Final Award until the date of full and final payment;

(ix)   All other claims are dismissed.

Place of Arbitration, The Hague, the Netherlands

Signed this 20 March 2023

(*signature page follows*)

**SIGNATURE PAGE**

Place of arbitration: The Hague, the Netherlands

Dated: 20 March 2023

_____
Ms. Nathalie Voser
Co-Arbitrator

_____
Mr. Paul Arrighi
Co-Arbitrator

_____
Ms. Bregje Korthals Altes
Chair